479 So.2d 350 (1985)
SUCCESSION OF Elma Balthazar MORAN.
No. 85-C-0819.
Supreme Court of Louisiana.
December 2, 1985.
Rehearing Denied January 9, 1986.
*351 Russell E. Gahagan, Gahagan & Gahagan, Natchitoches, for applicant.
Stephen Michael Henry, Daniel T. Murchison, Watson, Murchison, Crews, Arthur & Corkern, Natchitoches, for respondents.
DIXON, Chief Justice.
This is a declaratory judgment action brought by the executrix and residuary legatee, Cleo Ives Robertson, to have a codicil declared valid. Both the trial court and the court of appeal, 466 So.2d 512 (1985), held the document invalid because it contained a prohibited substitution.
Elma Balthazar Moran died testate, survived by neither ascendants nor descendants, leaving a valid statutory will dated February 24, 1976 and probated on September 14, 1981. Cleo Ives Robertson, the plaintiff-relator in this case, was named testamentary executrix, and as residuary legatee was to inherit 70-80 acres of Mrs. Moran's approximately 170 acres of farmland. The statutory will also left the following bequest to her nephews, Matthew and Marvin Jones, defendants-respondents:
"3.) I leave to Matthew Jones and Marvin Jones all of my land that lies East of the blacktop road and West of the Westernmost bayou that traverses my farm."
After Mrs. Moran's death, a half dozen codicils to this will were discovered in her safety deposit box. Only one of them was valid as to form. This one document, entirely written, dated and signed by the hand of the testatrix, provided:
 "Dec. 7-1977
If I should go before my husband, John, I want the piece of land on other side of road to bayou about fifty acers (sic) more or less to be his until his death then it will return to Cleo.
I am hoping everything will work out okay. Carry out as I wish.
 Sign
 Elma I.B. Moran"
The parties stipulated that this document was written, dated and signed by Mrs. Moran's hand; that "John" is Mrs. Moran's husband, and that "Cleo" is Cleo Ives Robertson, executrix and residuary legatee.
Relator Mrs. Robertson contends that the olographic codicil created a usufruct over the tract of land originally bequeathed to respondents in favor of Mr. Moran during his lifetime, with full ownership returning to her at his death. Under this interpretation, the codicil would constitute a tacit revocation of the earlier bequest of this piece of property to the Joneses.
Respondents Matthew and Marvin Jones argue that the codicil should be held invalid as containing a prohibited substitution, not a usufruct, and furthermore should be invalidated because the description of the property in the codicil is vague and ambiguous. Respondents argue that if the codicil is upheld, it must be interpreted to refer to a portion of the property bequeathed to Cleo Robertson as residuary legatee in the statutory will.
We find that the codicil does not contain a prohibited substitution in contravention of C.C. 1520, but instead creates a usufruct in favor of Mr. Moran with naked ownership to Cleo Robertson, with full ownership to return to her upon Mr. Moran's death. We further find that the codicil is clear and unambiguous, and refers to the property previously bequeathed to Matthew and Marvin Jones in the statutory will. The codicil constitutes a tacit revocation of this earlier bequest, and it does not refer to any portion of the 70-80 acres left to Mrs. Robertson as residuary legatee.

*352 I.
Under C.C. 1520:
"Substitutions are and remain prohibited, except as permitted by the laws relating to trusts.
Every disposition not in trust by which the donee, the heir, or legatee is charged to preserve for and to return a thing to a third person is null, even with regard to the donee, the instituted heir or the legatee."
In order to invalidate the codicil as a violation of the prohibition against substitutions in C.C. 1520, three elements must be present:
"(1) A double liberality, or a double disposition in full ownership, of the same thing to persons called to receive it, one after the other;
(2) Charge to preserve and transmit, imposed on the first beneficiary for the benefit of the second beneficiary;
(3) Establishment of a successive order that causes the substituted property to leave the inheritance of the burdened beneficiary and enter into the patrimony of the substituted beneficiary." Baten v. Taylor, 386 So.2d 333, 336 (La.1979); Report by the Louisiana State Law Institute to Accompany the Proposed Louisiana Trust Code, Vol. 3A LSA R.S. p. XXXIX (1965).
The prohibition against substitutions is in derogation of the faculty of disposition of property; it should be strictly construed and restricted to those cases clearly falling within the requirements above. Tucker, Substitutions, Fideicommissa and Trusts in Louisiana Law: A Semantical Reappraisal, 24 La.L.Rev. 439 (1964). When the terms of a disposition attacked as a prohibited substitution are susceptible to interpretation in two waysone that the disposition contains the elements of a prohibited substitution, and the other that it does not contain themit is preferable to uphold the interpretation that maintains the disposition. Id. at 492. When the terms of a disposition leave doubt as to whether ownership or usufruct of the property was intended, the interpretation that a usufruct was intended should be adopted. Id. at 493.
Our Civil Code provides rules of construction in interpreting testamentary dispositions. In the interpretation of a legacy, the court's first task is to determine the intent of the testator. C.C. 1712. A court must give a saving construction to a disposition whenever possible. C.C. 1713. Mrs. Moran wrote this codicil in layman's terms without the aid of counsel. Under such conditions, the courts must exempt language from technical restraint and seek the clear intention of the testatrix in a purpose consistent and rational with upholding the testament. Succession of Fertel, 208 La. 614, 23 So.2d 234 (1945).
We find that the intent of the testatrix was to create a usufruct in favor of her husband John to provide for him during his lifetime, with naked ownership of the property to Cleo.
The lack of reference to such terms as "use" or "use and benefit" or "enjoyment" of the property, relied upon by the courts below to negate Mrs. Moran's intent to create a usufruct, is not fatal to the validity of the bequest as a usufruct. Succession of Goode, 425 So.2d 673 (La.1982). What is required is a manifestation of the will of the testatrix to confer less than full ownership. Id. at 681. The directive that the property was only to be his "until his death" is such a manifestation. The reference to the "return" of full ownership of the property "to Cleo" supports the inference that Mrs. Moran merely wished to provide for her husband during his lifetime, but in fact intended for Cleo to own the property. Further support for this intent to create a usufruct is evidenced by the statutory will, drafted by a lawyer, which left Mr. Moran the use of the family house, in the event that he survived Mrs. Moran, for the remainder of his life.
The terms of the codicil do not contain either an express or implied charge to preserve and transmit the property to Cleo, as the lower courts held. The presence of the words "his until his death" and "then it will return to Cleo" negate the existence of any charge to preserve and transmit the property *353 burdening Mr. Moran. He merely gains the beneficial enjoyment of the property during his lifetime. Upon his death the full ownership of the property automatically reverts back to Cleo. He is under no charge to return or bequeath or deliver or transmit the property to Cleo, whose full ownership will be complete upon his death, consistent with the characteristics of a usufruct created for his lifetime.
The intent of the testatrix was obviously to provide for her husband during his lifetime. The absence of exact legal terminology to express that intent should not be permitted to negate her wishes. The creation of a usufruct does not violate the prohibition against substitutions. C.C. 1522. Accordingly, the codicil does not violate the prohibition against substitutions.

II.
Respondents Matthew and Marvin Jones contend that the codicil should be deemed void because it is vague and ambiguous as to which tract of land Mrs. Moran intended to bequeath. They also argue that because of this ambiguity, Mrs. Robertson cannot meet her burden of proving that the codicil tacitly revoked the bequest made to them in the statutory will, since she cannot prove that the two tracts are the same. They argue that if the codicil is upheld, this court must construe it to refer to a portion of the 70-80 acres originally left to Cleo Robertson as residuary legatee under the statutory will, and not to the 52 acres between the road and the bayou which was originally bequeathed to them under the will.
We find that the codicil clearly indicates that the tract of land which Mrs. Moran had in mind was the tract originally bequeathed to Matthew and Marvin Jones, and thus the codicil will not be deemed void because of ambiguity. The codicil operates as a tacit revocation of the earlier bequest of this tract to the Joneses.
Respondents' argument that the codicil is vague and unclear is based upon three of the identifying landmarks on the Moran farm. According to the record, the Moran house lies between Cane River to the west and Highway 119 (a blacktop road running north and south) to the east. The disputed tracts lie to the east of the house and the blacktop road. To the east of the road runs a levee board canal running north and south, which forms the boundary of the first tract of land. To the east of the canal there is a natural bayou, also running north and south. Between the canal and the bayou lies the second tract of land. The first tract of land, between the road and the canal, encompasses approximately 52 acres. This is the tract bequeathed to Matthew and Marvin Jones in the statutory will, by the following language: "I leave to Matthew Jones and Marvin Jones all of my land that lies East of the blacktop road and West of the Westernmost bayou that traverses my farm."
Mrs. Moran in this document referred to the levee board canal as a "bayou." From testimony in the record, reference to the canal as a bayou is not uncommon.
Between the canal, or first bayou, and the second bayou is another tract of land encompassing 40-60 acres which passed to Cleo Robertson as residuary legatee under the will. Past the second bayou is yet another tract of Moran land encompassing 42 acres which Mrs. Moran bequeathed to other relatives.
Respondents argue that the codicil, which referred to "the piece of land on other side of road to bayou about fifty acers (sic) more or less" is vague and unclear because Mrs. Moran wrote "bayou" instead of "canal." This argument falls because Mrs. Moran described the very same tract in the statutory will by reference to the "Westernmost bayou" (emphasis added) that crossed her farm. Respondents also argue that it is impossible to ascertain which "bayou" Mrs. Moran meant. The codicil states "on other side of road to bayou" (emphasis added) and specifies that the tract is about fifty acres. If Mrs. Moran had meant to specify all of her land past the road to the second (natural) bayou, she should have specified a hundred *354 acres more or less, not fifty. The only rational interpretation of this description is that Mrs. Moran was referring to the tract immediately past the road to the first body of water she termed a bayou (instead of canal) which encompassed approximately fifty acres.
Respondents also argue that for this property to "return" to Cleo, she must have originally been bequeathed it, and that accordingly the codicil was referring to the property between the first and second bayous which was left to Cleo as residuary legatee. However, it is just as logical to assume that Mrs. Moran intended to revoke the bequest of the first tract to the Joneses by virtue of the codicil. At the termination of the usufruct, the property will "return" in full ownership to Cleo.
The codicil is sufficiently clear to establish that the property referred to by Mrs. Moran was the same property originally left to the Joneses. Therefore, as an inconsistent disposition, the codicil is a tacit revocation of the bequest in the statutory will. Succession of Lefort, 139 La. 51, 71 So. 215 (1916); Succession of Hammett, 261 La. 909, 261 So.2d 611 (1972).
The Civil Code provides for tacit revocations as follows:
"The revocation of testaments by the act of the testator is express or tacit, general or particular.
. . . . .
It is tacit when it results from some other disposition of the testator, or from some act which supposes a change of will.
..." C.C. 1691.
"The act by which a testamentary disposition is revoked, must be made in one of the forms prescribed for testaments, and clothed with the same formalities." C.C. 1692.
"Posterior testaments, which do not, in an express manner, revoke the prior ones, annul in the latter only such of the dispositions therein contained as are incompatible with the new ones, or contrary to them, or entirely different." C.C. 1693.
"When a person had ordered two things, which are contradictory, that which is last written is presumed to be the will of the testator, in which he has persevered, and a derogation to what has before been written to the contrary." C.C. 1723.
If the codicil is in testamentary form, and makes a disposition incompatible with that of a prior testament, it is to be recognized as revoking the prior disposition. C.C. 1691, 1692, 1693 and 1723.
Accordingly, the judgments of the courts below are reversed, and there is now judgment for relator, Cleo Ives Robertson, testamentary executrix, and against respondents, Matthew Jones and Marvin Jones, at their cost, recognizing the validity of the codicil of December 7, 1977, which revoked the earlier testamentary bequest to respondents.
WATSON and BLANCHE, JJ., dissent and assign reasons.
BLANCHE, Judge (dissenting).
This writer is of the opinion that the bequest contained in the codicil created a double disposition in full ownership, a charge to preserve and a successive order spelled out by the testator, in contravention of Civil Code article 1520.
The trial court found that there is no language to indicate that a usufruct in favor of John Moran was intended. In fact, there is no language about use, usufruct, receipt of revenue, using it for his lifetime or anything else which would create a doubt as to whether something less than full ownership was intended. The Court of Appeal affirmed, and it is this writer's opinion that both were correct.
Though Civil Code article 1713 requires a saving construction whenever possible, the language relied upon by the testator cannot be ignored. The division of ownership into usufruct and naked ownership is a creation of the law, and it is doubtful that the testator understood the ramifications attendant with the language she used.
*355 This fact does not negate the clear intent of the testator, from the language of the codicil, to convey full ownership to her husband John.
Based on the facts of this case, our reasoning in Succession of Ledbetter, 147 La. 771, 85 So. 908 (1920) ought to control:
Article 1520 of the Code permits the giving of the usufruct property to one legatee and the naked ownership of the same property to another. But if every substitution, by which property is given to one legatee during his lifetime and at his death to another, is to be regarded as vesting a life usufruct in the one and the naked ownership in the other legatee, Article 1520, which prohibits such substitutions, must have lost its meaning.
For the reasons expressed herein, and for those expressed in Succession of Goode, 425 So.2d 673 (La.1982) (Blanche, J. dissenting), I respectfully dissent.
WATSON, Justice, dissenting.
The majority errs in recognizing the testatrix's olographic codicil[1] of December 7, 1977, as a valid revocation of the bequest made to the Jones brothers in her statutory will. The disposition is a prohibited substitution, and therefore invalid.[2] Mr. Moran is charged to preserve and transmit the property to Cleo Ives Robertson. Compare Baten v. Taylor, 386 So.2d 333 (La., 1979). There is no language indicating a usufruct. The disposition to Mr. Moran does not refer to the use, enjoyment, or fruits of the property; the property is simply to be "his". Succession of Goode[3] held that the word "payments" in relation to mineral rights was sufficient to constitute a usufruct. However, no similar reference to the fruits of the property is present here.
Moreover, the codicil, the only one of many which was valid as to form, is too vague and ambiguous to be upheld. The property description involved in the disposition could refer to at least two tracts of land.
In straining to uphold one of the testatrix's many errant notions about her estate, the majority writes Article 1520 out of the Civil Code. Mrs. Moran's intention was to give the full ownership of the property to her husband and then, upon his death, to Cleo Robertson, clearly a prohibited substitution, both in word and meaning.
I respectfully dissent.
NOTES
[1] The codicil of December 7, 1977, states:
 "Dec. 7-1977

"If I should go before my husband, John, I want the piece of land on other side of road to bayou about fifty acers (sic) more or less to be his until his death then it will return to Cleo.
"I am hoping everything will work out okay. Carry out as I wish.
 "Sign
 "Elma I.B. Moran"

[2] LSA-C.C. art. 1520 provides:

"Substitutions are and remain prohibited, except as permitted by the laws relating to trusts.
"Every disposition not in trust by which the donee, the heir, or legatee is charged to preserve for and to return a thing to a third person is null, even with regard to the donee, the instituted heir or the legatee."
[3] 425 So.2d 673 (La., 1982).